LORETTA FARINELLI *vs.* EDWARD H. LAVENTURE.

Worcester. January 4, 1961. — March 3, 1961.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Negligence,* Skating rink, Assumption of risk.

In an action against the proprietor of a skating rink by a ten year old girl patron for personal injuries sustained one afternoon while she was skating by herself when she was bumped or tripped by a line of five or six skaters who were holding hands and was caused to fall, evidence that the formation of such lines was against the defendant's rules and that two ushers of his charged with the duty to prevent their forming had stopped some such lines that afternoon but that others had formed warranted a finding of negligence of the proprietor, and a ruling that the plaintiff had assumed the risk of injury was not required.

TORT. Writ in the Superior Court dated August 16, 1955.

The action was tried before *Dewing, J.*

*Alexander Eggleston,* for the plaintiff.

*Henry G. Bowen,* for the defendant.

WHITTEMORE, J. This action of tort is to recover for injuries sustained by the plaintiff on October 24, 1954, while roller skating at the defendant's rink in Fitchburg. The

Farinelli *v.* Laventure.

judge, under leave reserved, set aside a verdict for the plaintiff and entered a verdict for the defendant. The plaintiff duly excepted.

. The jury could have found these facts: While the plaintiff, then ten years of age, was skating by herself she was bumped or tripped by a line of five or six skaters who were holding hands. The plaintiff fell and was injured. The plaintiff had been to the rink eight or nine times, had not skated elsewhere, and was "a beginner but a fair skater." The accident happened at a time when the directions given by the management were that "all skate," meaning that everyone on the rink could skate, but no more than two skaters hand in hand. In "trio skate" three persons might skate together; at other times there were other directions such as "ladies only" or "couples only."

There had been no "trio number" prior to 3:30 P.M. and up to that time "the maximum number allowed to skate hand in hand was two." Nevertheless, as the plaintiff testified, lines had been doing the "whip" in the course of the afternoon. For the "whip," five or six skaters would hold hands and skate fast, keep "going until they came to a curve, and then they let go . . . [and] everybody would go in different directions" and "knock people down." This was against the rules ("We do not recognize the whip"). There were two ushers on the rink at all times whose admitted duties were to deter fast skating, and stop "any bad conduct." The defendant was in "complete charge" with power to eject offenders. Inferentially it was the duty of the ushers to stop whips, and lines of more than two skaters, or more than three skaters on a "trio number." One of the ushers testified he had never seen a whip at the rink. The plaintiff, however, as she testified, saw the whip going on "all the time"; she was uncertain how many were knocked down by the whip. "I don't know . . . exactly. Q. Well, was it a dozen or two dozen, or what? A. About two dozen." The ushers "stopped some of them" but "some of them would" start up again. This was going on all afternoon "from half past one until four

o'clock," when the accident occurred according to the plaintiff.[1]

There was no testimony that the line of skaters which bumped the plaintiff was about to snap the whip. The plaintiff showed by her testimony that she had inferred that it was a whip line. "Q. You don't mean that . . . this whip . . . knocked other people down, do you . . .? A. Well, it knocked me down. . . . Q. [T]hey hadn't snapped the whip after they went by you . . . is that right? A. Yes. . . . I don't think they were doing that; . . . they were just holding hands. . . . Q. It was just five or six skaters going by you hand in hand that accidentally bumped into you . . . is that right . . .? A. Yes."

Perhaps the same inference could have been drawn by the jury, but we need not decide that. The jury reasonably could have concluded that if throughout the afternoon whips and skating hand in hand by more than two skaters had been effectively deterred, the line of skaters which ran into the plaintiff would not have formed. It is not controlling that there was no evidence to show that the skaters in the line which hit the plaintiff had previously formed a whip line or been skating together. The jury reasonably could have concluded that a line of five or six skaters made collision with a single skater much more likely and hence that it was a cause of the plaintiff's injury.

Doubtless it could have been found that some groups of skaters would form contrary to the rules notwithstanding all reasonable efforts to deter them. It was, however, for the jury to say whether the defendant had done all that was reasonably required to prevent injury from this known and recognized danger. *Rawson* v. *Massachusetts Operating Co. Inc.* 328 Mass. 558, 560, and cases cited. *Greco* v. *Sum-*

---

[1] The defendant testified that the accident occurred about 2:15 P.M., that he saw the plaintiff and the girl with whom she was skating fall down when "their feet . . . [got] mixed up." The plaintiff's younger sister, as she testified, saw lines of three people holding hands on "all skate" and "about five times . . . there would be five" holding hands. The auditor had found that "there was no fast skating, 'whip line,' group or formation skating other than by two's prior to the accident . . . [and that] the plaintiff . . . was caused to fall by her skates becoming entangled with those of her friend."

ner Tavern Inc. 333 Mass. 144. Ephremian v. Sholes, 72 R. I. 395, 401–402. Compare Boehm v. S. S. Kresge Co. 336 Mass. 320; Doherty v. Boston Garden-Arena Corp. 338 Mass. 791; Emerson v. Riverview Rink & Ballroom, 233 Wis. 595.

We assume that a skater at an indoor rink assumes the risk of being bumped by another skater. But the facts do not require the ruling that the plaintiff assumed the risk of being injured by a line of skaters, in the circumstances that the formation of such a line was against the rules, and that the defendant, by the conduct of his ushers in stopping some such lines, had recognized his obligation to prevent them. The plaintiff's conduct must be judged in the light of her "immaturity . . . [and] the lack of the caution and judgment natural to youth." Berdos v. Tremont & Suffolk Mills, 209 Mass. 489, 495. Ducas v. Prince, 336 Mass. 555, 557. The plaintiff could to some extent rely on the defendant's obligation to keep the rink in a reasonably safe condition for those using it. Lemoine v. Springfield Hockey Assn. Inc. 307 Mass. 102, 105, and cases cited. The case of Pouliot v. Black, 341 Mass. 531, is distinguishable for the risk of being hit by a golf ball while collecting balls on a driving range was inherent in the activity. Compare also Katz v. Gow, 321 Mass. 666 (adult injured at golf driving range); Shaw v. Boston Am. League Baseball Co. 325 Mass. 419, 422–423.

The defendant does not argue that the posted signs reading "not responsible for accidents to patrons" bar recovery. See O'Brien v. Freeman, 299 Mass. 20.

Although the testimony of the plaintiff was, in important respects, uncorroborated and contradicted, and could have been deemed of slight weight on balance with other testimony, it was sufficient, if accepted, to warrant a verdict.

*Exceptions sustained.*
*Judgment for the plaintiff on the verdict.*